R.S., by his next friend
Ryan Sims, Sr.,
RYAN SIMS, SR.,
AMOLA SIMS,

T.J., by his next friend
Terrence Johnson;
TERRENCE JOHNSON,
CATHERINE JOHNSON,

D.B. by his next friend
Clarence Brown,
CLARENCE BROWN,
THERESA BROWN,

T.G. by his next friend
Nicole Garcia,
NICOLE GARCIA,

A.L. by his next friend
Stacey Osley,
STACEY OSLEY,

A.L. #2, by his next friend
Alex Flynn,

TIMOTHY WINSTON OWENS,

B.L., by his next friend
Lisa Brendt,
LISA BRENDT,

I.W. by his next friend
Valerie Williams,
VALERIE WILLIAMS,

        Plaintiffs,

   v.                       Case No. 02-C-0555

BOARD OF SCHOOL DIRECTORS
OF THE PUBLIC SCHOOLS OF THE
CITY OF MILWAUKEE,

PETER LAWRENCE ADAMS, individually
and in his official capacity as a
Milwaukee Public Schools teacher,

COMPCARE HEALTH SERVICES
INSURANCE CORP., a domestic corporation
that may have provided benefits on behalf
of plaintiff T.J.,

HUMANA INSURANCE CO., a domestic
corporation that may have provided benefits
on behalf of plaintiff T.J.,

HUMANA INSURANCE CO., a domestic
corporation that may have provided benefits
on behalf of plaintiff A.L.,

WISCONSIN HEALTH FUND, a domestic
corporation that may have provided
benefits on behalf of plaintiff D.B.,

STATE OF WISCONSIN, DEPARTMENT OF
JUSTICE CRIME VICTIM COMPENSATION
PROGRAM, a public corporation that may have
provided benefits on behalf of plaintiff T.G.,

                    Defendants.

---

MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT BOARD OF SCHOOL DIRECTORS' MOTION
FOR SUMMARY JUDGMENT
AND DISMISSING CLAIM OF TIMOTHY OWENS

For the reasons stated below, this court is granting in part and denying in part the

summary judgment motion of the Board of School Directors of the Public Schools of the

City of Milwaukee.

## Findings of Fact

Peter Adams, a teacher in elementary schools operated by the Board of Directors of the Public Schools of the City of Milwaukee (MPS), sexually molested a number of his students.

I.      Incident Involving Timothy Owens

Plaintiff Timothy Owens, born in 1980, was a student in Adams' 4th or 5th grade at Victory School.  When Owens was 11 or 12 years old (i.e., in 1991 or 1992) Adams showed sexual interest in him.  On two occasions, Adams spoke to Owens in a sexual manner and looked at him inappropriately; on a third occasion, Adams touched Owens inappropriately.  (Smokowicz Affidavit pp. 000246-47).  Owens reported the touching incident to his mother the day it occurred, and she called the police.  Owens then spoke with the police about what had occurred.  When the police sought to put a monitor on Owens, his mother would not give them permission to do so.  She took Owens out of school the following day and he remained out of school for the rest of the year.

II.     Incidents at Congress Elementary School (Congress)

Adams taught at Congress until the 1998-1999 school year.  During that time, plaintiff T.G. was a student in Adams's 3rd or 4th grade class.  Adams touched T.G. in a sexual manner approximately once every day for the entire school year until T.G. moved out of state in the last month of the year.

In 1999, Adams molested plaintiffs A.L. #2 and I.W.  He had sexual contact with I.W. on three occasions.  I.W. told his brother about these incidents at the time, but he did not report them to an adult.

3

About two or three times a day, starting approximately a month after school began, Adams engaged in sexual misconduct with plaintiff D.B. These incidents occurred in Adams' classroom behind a "tall thing where . . . no one could see." (Smokowicz Affidavit, p. 000226).

Sean Goldner, a teacher at Congress Elementary School, reported to Congress' Principal Minkley that Adams had students on his lap during school hours. (Goldner's dep., p. 16). The principal at Congress also knew that Adams' students had not been coming to gym or art. However, she did not initiate any disciplinary action against Adams during his tenure at Congress.

During Adams' last semester at Congress, the furniture in his classroom obstructed the view of the classroom and of his desk. However, the principal did not confront him about the layout of the room. On some of Minkley's visits to Adams' classroom, the door was locked; however, other teachers locked their classrooms occasionally too. Even so, Minkley had the ability to enter a locked classroom by using her master key.

III. Incidents at Dr. Benjamin Carson Academy (Carson)

During the 1999-2000 school year, Adams was teaching at the Dr. Benjamin Carson Academy, another elementary school operated by MPS.

At that time, plaintiff T.J. was a student in Adams' 4th grade class. Starting in October 1999, Adams engaged in misconduct with T.J.

Plaintiff A.L. was a student in Adams' 5th grade class at Carson. Adams had inappropriate sexual contact with A.L. at the school on one occasion, but A.L. cannot recall the exact date.

4

An incident involving T.C. occurred in January 2000 and was handled internally at the school. T.C. complained that Adams touched her posterior as she was entering the classroom. T.C.'s mother reported the incident to Principal Deborah Thompson and requested a meeting with Thompson. Thompson met with the mother, T.C., Adams, and Yvonne Hopgood – a Leadership Specialist in charge of principals.

At the meeting, T.C. recounted the incident. Thompson asked T.C. if anyone witnessed the incident and whether Adams touched anyone else. T.C. replied that Adams always asked people for hugs. Adams denied misconduct with T.C.

After the meeting with T.C., Hopgood and Thompson agreed that further hearings were unwarranted, because, without corroboration, it would be T.C.'s word against Adams'. Hopgood felt that the contact between Adams and T.C. may have been accidental and did not amount to child abuse.

Neither Hopgood nor Thompson reported the incident to the police or Child Protective Services. T.C.'s mother removed T.C. from the school shortly after the meeting.

Plaintiff B.L. was a student in Adams' 4th grade class. Adams was involved in a sexual incident with B.L. on one occasion around January 2001.

R.S. was a student in Adams' 4th grade class. In January 2001, R.S. told his mother that Adams "fondled his penis" on three different occasions. R.S. had told only his mother and classmate D.C. of the incident. On January 29, 2001, the mother called Thompson to report R.S.' complaint. Thompson invited the mother to come to school the next day to fill out a parent complaint form and said that she (Thompson) needed a statement from R.S. R.S. was removed from Adams' class after the mother complained to Thompson.

5

IV.    School and Police Investigations in Response R.S.' Complaint

In response to R.S.' complaint, Thompson called the police on January 31, 2001, to report Adams' behavior. Detective William Herold and Officer Christian – officers assigned to the case – spoke to Thompson, who said that the school would conduct an internal investigation into R.S.' allegations.

Herold then interviewed R.S. in the school office outside Thompson's presence. R.S. told Herold that he (R.S.) did not like Adams because Adams touched his private part. Next, Herold interviewed Adams outside Thompson's presence. Adams stated that he might have hugged R.S., and that he has hugged other students for various reasons, but denied improper sexual contact with any of the children. Herold also interviewed R.S.'s mother, after which his involvement with the investigation ended.

The police uncovered no witnesses to the incident between R.S. and Adams. R.S. told the police that he had spoken to D.C. about the incident and that Adams also molested D.C. However, D.C. denied it to Officer Christian.

Because of the seriousness of R.S.' allegations, Thompson initiated an emergency misconduct proceeding against Adams. She contacted her supervisor, Leadership Specialist Dorothy St. Charles, on January 30, 2001. St. Charles told Thompson (1) to interview students, and (2) to hand-deliver a letter to Adams. Thompson did so on January 31, 2001. The letter directed Adams (1) to absent himself from his duties effective February 1, 2001, and (2) to appear at a School Board hearing on February 5, 2001.

Leadership Specialist Therese Campos conducted Adams' emergency misconduct hearing. Thompson, Adams and a teacher's union representative were present. The evidence presented to Campos consisted of: (1) one student complaining that Adams

6

touched him inappropriately; (2) other students stating that Adams tickled them; (3) one or more students talking about sitting on Adams' lap.

At the hearing, Adams' union representative asked him whether the allegations were true. Adams only admitted to tickling students. The union representative added that the district attorney had already declined to charge Adams.

On February 5, 2001, Campos sent Adams a letter stating that the evidence at the hearing may support a finding of serious misconduct on his part. The supporting evidence came from students' statements presented at the hearing. Adams returned to work on February 6, while the misconduct process continued.

After the hearing concluded, St. Charles held another (second level) hearing on February 16, 2001. Although she deemed tickling and lap-sitting inappropriate, there were no corroborations of sexual touching. A warning letter placed in Adams' file ordered him to stop tickling students and placing them on his lap. That concluded the hearing process.

V.    School and Police Investigations in Response to D.C.'s Complaint

Thompson first learned of D.C.'s allegations of assault from talking to R.S.' mother. Thompson's Assistant Principal, Dawn Rice, interviewed D.C. at Thompson's request and prepared a report detailing the interview. At that time, D.C. only stated that Adams tickled his stomach and that he sat on Adams's lap. D.C.'s allegations against Adams resurfaced a month after R.S.' complaint. D.C.'s foster mother reported that Adams committed sexual acts against her son, such as pulling his (D.C.'s) pants down in the bathroom.

Upon hearing D.C.'s complaint, Thompson called Child Protective Services, the police, and her supervisor St. Charles. After receiving Thompson's call, St. Charles

initiated another emergency misconduct process; she ordered Adams to absent himself from school and scheduled a hearing for March 8, 2001.

On March 2, 2001, the police assigned Detective Greg Jackson and Officer Christian to investigate D.C.'s complaint. Jackson and Christian first spoke to Thompson, who familiarized them with the situation. Christian, who interviewed D.C. previously, understood that he changed his story. Thompson said that she believed D.C. She added that a parent complained about Adams having fourth-graders sit on his lap, and that she told Adams this was inappropriate. Jackson next took a statement from Adams, who denied inappropriate conduct.

After interviewing Adams, Jackson began talking to students. Having obtained T.C.'s name from Thompson, Jackson and Christian spoke to T.C. about her complaint that Adams pinched her posterior. Christian interviewed T.C. at her residence outside her parents' presence. Jackson spoke to T.C.'s mother who informed him that she had complained about the incident to Thompson.

Jackson next spoke to T.W., a non-plaintiff, who complained about incidents that occurred in 1999. T.W. was afraid to complain earlier, because Adams made a threatening gesture toward him in class. T.W. gave Jackson the name of plaintiff A.L. #2, to whom the police spoke next. A.L. #2, who transferred to Carson from Congress, told Jackson that Adams molested him at Congress in September 1999.

Jackson spoke to plaintiff I.W., who maintained that Adams had molested him in the "think tank" -- a secluded area of the classroom where students were supposed to come up with ideas. The "think tank" was out of the view of other students and surrounded by tall cabinets. The only other person I.W. told about the abuse was his brother.

Jackson next interviewed non-plaintiff J.G., Adams' student from Congress. J.G., who lived with his mother and Adams, claimed that Adams spanked him on his bare buttocks with a ruler. In addition, Jackson contacted the Bureau of Child Welfare to get J.G. out of the house. J.G.'s interview led to Adams' arrest on April 18, 2001.

Jackson interviewed plaintiff D.B., who, until then, had only told his cousin and a classmate of Adams' inappropriate actions toward him. The cousin advised D.B. to tell his parents, but D.B. had not done so. Jackson was the first adult to learn of D.B.'s allegations.

Non-plaintiff R.S. told Christian that while he (R.S.) was a student at Carson, Adams asked to let him observe R.S. urinate, then reached down into R.S.' underwear and squeezed his penis and testicles.

Christian spoke with plaintiff B.L. also, and was told that Adams touched him inappropriately at Carson. B.L. reported these incidents to his mother for the first time in spring of 2001 after Adams' arrest.

Plaintiff A.L. told Christian that Adams had him stay after class while the rest of the students went to music class; Adams then sat A.L. on his lap and rubbed A.L.'s penis over his clothing. A.L. told his pastor about it after Adams was arrested. However, he did not mention anything to any adults before the arrest.

On April 23, 2001, plaintiff T.J. told Jackson that in October 1999, Adams followed him to the bathroom, told him to pull down his pants and underwear and held his penis while he urinated. T.J. spoke of the incident for the first time to his father in April of 2001 after learning of Adams' arrest.

9

In the last interview, plaintiff T.G. told Christian that on ten or more occasions at Congress, Adams exposed his penis to T.G. and asked him to rub it up and down. Adams also had T.G. expose his (T.G.'s) penis and rubbed it up and down. This occurred in class, while the students had their heads down, and in the "think tank." Until the interview with Christian, T.G. had not told any adults about the abuse, but he had told a classmate.

VI.     Pertinent Board Policies and Instructions

In 1982, MPS promulgated a written policy prohibiting sexual harassment of its employees and students. As of 1995, that policy stated that "[t]he Milwaukee Public Schools does not tolerate sexual harassment in any form and will take all necessary and appropriate action to eliminate it up to and including termination and expulsion of offenders." As of 1995, the policy defined "sexual harassment" as consisting of "unwelcome sexual advance, requests for sexual favors, sexually motivated physical conduct or other verbal or physical conduct of a sexual nature that would be offensive to a reasonable person."

At all times pertinent to the lawsuit, another policy prohibited student sexual harassment, prohibiting "any student, teacher, administrator, or other school personnel of the district [from] harass[ing] a student, teacher, administrator, or other school personnel through conduct or communication of a sexual nature as defined by this policy."

VII.    Adams' Response to the Lawsuit

Adams was served with a summons and complaint in this lawsuit, but did not contact the school or his criminal defense attorney about representation in the civil lawsuit. Moreover, he declined to send the City Attorney's Office any correspondence asking for representation in this lawsuit.

10

Plaintiffs brought this action against MPS, claiming that defendant (1) violated their constitutional rights under the Due Process and Equal Protection provisions of the U.S. Constitution; (2) discriminated against plaintiffs in violation of Title IX; and (3) breached its duty to plaintiffs under Wisconsin law. Further, plaintiffs claim that MPS must indemnify Adams for the judgment obtained against him by plaintiffs.

I.      Standard for Summary Judgment

Under Rule 56(c), Fed. R. Civ. P., summary judgment is proper when the pleadings and other submissions in the case show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). After adequate time for discovery, summary judgment is appropriate against a party who fails to establish an essential element of that party's case on which that party bears the burden of proof at trial. *Celotex*, 477 U.S. at 322. A factual dispute between the parties will not defeat a properly supported summary judgment motion unless it might affect the outcome or resolution of issues before the court. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A genuine issue of material fact exists only where a reasonable finder of fact could decide for the nonmoving party. *Anderson*, 477 U.S. at 248 (1986); *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine need for trial and summary judgment is proper. *Matshushita Elec. Indus. Co., Lt. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating entitlement to judgment as a matter of law. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving

party must designate specific facts supporting or defending each element of the action, showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 322-23. When the nonmovant has the burden of proof at trial, that party must produce evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; see also, *Celotex*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . . "); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322 (emphasis added). A party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials," but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also, Celotex*, 477 U.S. at 322-23; *Becker v. Tenenbaum-Hill Associates, Inc.*, 914 F.2d 107, 110 (7th Cir. 1990).

To defeat summary judgment, the nonmoving party must engage in more than a mere swearing match. *Matter of Wade*, 969 F.2d 241, 245 (7th Cir. 1992). While the resolution of factual disputes, the sufficiency of evidence and the relative credibility of the parties are matters generally left to a jury or fact-finder at trial, summary judgment is nonetheless appropriate where the evidence is so one-sided that one party must prevail

as a matter of law.  *Anderson*, 477 U.S. at 251-252.  Unsupported allegations do not suffice where the evidence presented by the plaintiff to support his claim is merely colorable.  If a party's allegations are based on mere conjecture, and are merely colorable or conclusory, and not significantly probative of material facts, denial of a motion for summary judgment is justified.  *Id.*, at 249-50.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party.  *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989).  "However, we are not required to draw every conceivable inference from the record — only those inferences that are reasonable."  *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

II.     Equal Protection Claim

The Equal Protection clause of the Fourteenth Amendment provides that "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV §1.

Plaintiffs have not alleged an Equal Protection violation based on gender or race.  One of the victims, T.C., is female; the rest are male.  Indeed, the plaintiffs do not identify any students' race.  It is unclear whether they belong to one or more races. Nor do plaintiffs point to any facts in the record indicating that MPS assigned students to Adams' class based on race or gender.  Further, plaintiffs do not state on what grounds MPS discriminated against them when it assigned them to Adams' class.  For those reasons, no heightened standard of scrutiny applies in this case.  Therefore, to prevail on Equal Protection grounds, plaintiffs must establish that the discriminatory intent of MPS in assigning the plaintiff students rather than other students similarly situated was not

13

rationally related to a legitimate state interest.  *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 951 (7th Cir. 2002).  However, plaintiffs do not state how MPS assigned students to classes nor have they set forth any facts indicating that MPS' class assignment methods are not rationally related to a legitimate state interest -- education of students in Milwaukee. It follows that the defendants are entitled to summary judgment dismissing the plaintiffs' Equal Protection claim.

III.      Substantive Due Process Claim

The Due Process clause of the Fourteenth Amendment provides that  "[n]o state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."  U.S. Const. amend. XIV §1.  The Due Process clause "is not 'a guarantee of certain minimal levels of safety and security.'"  *J.O. v. Alton Comm. Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989)).  The protection arises where "the state has exercised its power so as to render an individual unable to care for himself or herself . . . "  *Id.*

To prove a Due Process violation, plaintiffs must show that (1) execution of MPS' policies placed students in danger of molestation by a sexual predator, *Monell v. Dep't. of Soc. Servs of N.Y.*, 436 U.S. 658, 694 (1978); or (2) MPS knew of the danger and did nothing to rectify it, thus fulfilling *Alton's* requirement of exercising state power to "render students unable to care for themselves."  909 F.2d at 272.

MPS asserts, and plaintiffs do not dispute, that MPS enacted policies prohibiting sexual harassment and punishment for persons for violating that policy.  Hence, it is impossible for the plaintiffs to establish that MPS violated plaintiffs' substantive Due

14

Process rights under the first prong.  On the other hand, MPS has failed to show that the plaintiffs are unable to prevail under the second prong.  MPS does not state what its board of directors knew and did not know.  Moreover, school principals Minkley and Thompson certainly were aware of complaints of student abuse from Owens and T.C. long before misconduct hearings began.  However, MPS does not state whether Minkley and/or Thompson reported those allegations to the board and how the board responded.  Further, under *Alton*, plaintiffs can prevail if they prove that MPS knew of the allegations of abuse, but did nothing to address them.  Therefore, a genuine issue of material fact exists as to whether MPS was in the dark or knew of pupil abuse and willfully or recklessly ignored the allegations.  For those reasons, summary judgment on plaintiffs' Due Process claim must be denied.

IV.     Title IX Claim

Title IX states that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

The Supreme Court has held that Title IX's prohibition against discrimination includes sexual harassment.  *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 75 (1992).  The Court based its holding on a Title VII case, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986).  *Franklin,* 503 U.S. at 75.  Since then, federal courts have applied Title VII analysis to claims of discrimination under Title IX.  *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002) (same-sex harassment); *Doe v. Univ. of Illinois*, 138 F.3d 653, 665 (7th Cir. 1998), vacated, 526 U.S. 1142 (1999) (hostile environment)*;*

*Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 248-249 (2nd Cir.1995) (sexual harassment by teacher); *Preston v. Virginia ex rel. New River Community Coll.*, 31 F.3d 203, 206 (4th Cir.1994) (employment discrimination).

Thus, the court applies Title VII sexual harassment analysis to the plaintiffs' Title IX claim. In *Holman v. Indiana*, the Seventh Circuit rejected a sexual harassment claim by a husband and wife, both of whom were harassed by the same supervisor. 211 F.3d 399 (2000). In so doing, the court stated that "Title VII does not cover the 'equal opportunity' or 'bisexual' harasser . . . because such a person is not discriminating on the basis of sex." *Id.* at 403. In this case, plaintiffs and defendant agree that at least one of the victims, T.C., was female. This fact renders Title IX inapplicable, because Adams was a bisexual child abuser who did not harass solely male students or solely female students or discriminate on the basis of a student's sex. Consequently, defendant's motion for summary judgment on plaintiffs' Title IX claim is granted.

V.      State Law Claims

Next, the court turns to plaintiffs' state law claim that MPS supervised Adams negligently. Generally, Wisconsin law grants immunity to public officers for acts performed within the scope of their duties. Wis. Stat. 893.80; *see also Sheridan v. Janesville*, 164 Wis. 2d 420, 425 (1991). However, there are two exceptions to the immunity rule: (1) immunity is not available to public officers who are negligent in performing a ministerial duty; and (2) public officers are liable for willful, malicious, or intentional conduct. *Id.* (citing *Lister v. Bd. of Regents*, 72 Wis. 2d 282, 299 (1976)). Additionally, government actions are not immune to legal attack if "the danger is compelling and known to the officer and is

16

of such force that the public officer has no discretion not to act." *Sheridan,* 164 Wis. 2d at 426 (quoting *C.L. v. Olson*, 143 Wis. 2d 701, 706 (1988)).

      1.    <u>"Ministerial Duty" Exception</u>

A duty is ministerial only if "it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." <u>Id.</u> In the case at bar, plaintiffs argue that MPS had a ministerial duty to report Adams to authorities for sexual abuse. However, before reporting the abuse, MPS officials must investigate the complaints and exercise their judgment and discretion in determining whether there was any substance to charges brought to the attention of responsible officials. *Compare Kimps v. Hill*, 200 Wis. 2d 1, 12 (1996) ("'[T]ime, mode and occasion' for performing an investigation of [an] accident and determination of the appropriate corrective action . . . remained totally within [defendant's] judgment and discretion."), *with Bicknese v. Sutula*, 260 Wis. 2d 713, 735 (2003) ("[I]n making the job offer to [plaintiff], [defendant] was under a ministerial duty to correctly set the terms of the offer.")

To prevail under the "ministerial duty" exception, plaintiffs must show that defendant had no substantive determinations to make. *See Snyder v. Nolen*, 380 F.3d 279, 288 (7th Cir. 2004) ("duty . . . to maintain the official record was purely ministerial; [defendant] had no authority . . . to make substantive determinations on the worth or merits of a filing"). What plaintiffs are really saying is that MPS "botched" the Owens investigation, thereby endangering other students. However, "[i]mmunity presupposes negligence and has no reason for existence without it." *Kierstyn v. Racine Unified Sch. Dist.*, 228 Wis. 2d 81, 95

17

(1999). Thus, the "ministerial duty" exception is inapplicable in this case to the extent that plaintiffs claim that MPS was negligent in performing its discretionary task of investigating charges against a classroom teacher.

For those reasons, the "ministerial duty" exception does not apply.

2.    "Known Danger" Exception

Plaintiffs' alternative contention is that MPS failed to act in the face of known danger. To prevail under the "known danger" exception, plaintiffs must demonstrate "a known present danger of such force that the time, mode and occasion for performance is evident with such certainty that nothing remains for the exercise of judgment and discretion." *C.L. v. Olson*, 143 Wis. 2d 701, 717 (1988). For the "known danger" exception to apply, the danger must be so certain as to leave state officials without discretion. *Compare Linville v. City of Janesville*, 174 Wis. 2d 571 (Ct. App. 1993) (known danger existed where occupants were trapped in a submerged van), *and Domino v. Walworth County*, 118 Wis. 2d 488 (Ct. App. 1984) (known danger existed where a tree fell across the road at night), *with Lodl v. Progressive N. Ins. Co.*, 253 Wis. 2d 323 (2002) (a failed traffic light did not constitute known danger requiring a specific response from a police officer), *and Kierstyn v. Racine Unified Sch. Dist.*, 228 Wis. 2d 81 (1999) (reduction of benefits resulting from an erroneous advice of a school official does not amount to known danger).

The lack of discretion is the common thread between the "ministerial duty" and the "known danger" exceptions. *Lodl v. Progressive N. Ins. Co.*, 253 Wis. 2d 323, 344 (2002) ("[B]oth exceptions derive from the principle that only discretionary acts are immunized"). As noted above, MPS had to investigate any misconduct allegations brought to its attention

18

before taking action against Adams. Moreover, nothing in the record establishes that MPS had strict guidelines or rules dictating the decisions to be made with respect to such matters. Hence, the "known danger" exception does not apply, and summary judgment must be granted for MPS regarding plaintiffs' state law claims.

VI.    <u>Indemnification of Adams by MPS</u>

MPS maintains that as a matter of law, it has no duty to indemnify Adams respecting the plaintiffs' claims in this case. It submits that Adams acknowledged during a deposition taken by the plaintiffs that he received the summons and complaint yet neglected to contact MPS or the Milwaukee City Attorney to request representation. Also, according to MPS, Adams' inaction was effectively a refusal to cooperate in the defense of this case. Further, MPS offers that Adams was acting outside the scope of his employment when he molested his pupils.

On the scope of duty and cooperation in defenses Wisconsin law provides as follows:

> If the defendant in any action or special proceeding is a public officer or employee and is proceeded against in an official capacity or is proceeded against as an individual because of acts committed while carrying out duties as an officer or employee and the jury or the court finds that the defendant was acting within the scope of employment, the judgment as to damages and costs entered against the officer or employee in excess of any insurance applicable to the officer or employee shall be paid by the state or political subdivision of which the defendant is an officer or employee.

Wis. Stat. 895.46(1)(a). Examination of all case law leads this court to conclude that it does not support the ruling urged by MPS. Section 895.46(1)(a) requires a government unit to indemnify an employee for damages flowing from intentional actions taken during the scope of employment. *Graham v. Sauk Prairie Police Com'n*, 915 F2d. 1085, 1090 (7th

19

Cir. 1990). Moreover, whether the employee was acting within the scope of his employment must be resolved by the trier of fact at trial, rather than by the court on a motion for summary judgment. *Id. See also Olson v. Connelly*, 156 Wis. 2d 488 (1990) ("[I]n scope of employment cases, consideration must be given to whether the employee was actuated, at least in part, by a purpose to serve the employer."). Determination of the employee's motivation, however, is not for the court on a motion for summary judgment; instead, it is a question of fact within the jury's province. *See, e.g., Carney v. White*, 843 F. Supp. 462, 479-80 (E.D. Wis. 1994) ("Whether an employee was acting within the scope of his employment is a material issue of fact to be determined by the trier of fact."); *Doe v. ABC Ins. Co.*, 863 F. Supp. 884, 892 (E.D. Wis. 1994) ("[Q]uestions about whether or not [defendant], if guilty of wrongdoing, was acting within the scope of his employment is an issue of fact for trial.") Therefore, Adams' failure to advise MPS or the Milwaukee City Attorney directly that he was sued by plaintiff would not preclude plaintiffs from recovering damages from MPS; rather, it would merely relieve MPS of responsibility for attorney fees and costs Adams may have incurred in defending this action on his own.

VII.    Equitable Tolling of Timothy Owens' Claims

Next, defendant claims, and plaintiffs concede, that Owens' claims are barred by the statute of limitations. However, plaintiffs argue that the court should toll the statute of limitations based on equity. (Pl. Br. at 31-32). Plaintiffs assert that, as an 11-year-old boy, Owens "could not have been aware [that] the legal principles that place liability for Mr. Adams' actions also [apply to] MPS." (Pl. Br., at 33).

In *Doe v. ABC Ins. Co.*, 863 F. Supp. 884, 886 (E.D. Wis. 1994) the court tolled the statute of limitations under similar circumstances. There, the 26-year-old plaintiff filed a

20

claim against her former teacher and the school board regarding an assault which took place when she was age 12 and in sixth grade. *Id.* The case turned on "when the clock starts to run." *Id.* at 889. The court tolled the statute of limitations, reasoning that plaintiff may argue that "she didn't really know of her injury and damage until [much later]." *Id.* at 891.

Although this case bears a resemblance to *Doe* – Owens was young when Adams abused him and claims ignorance of the injury at the time – there is one major difference between Owens and the plaintiff in *Doe.* On the day Adams touched Owens, Owens related the incident to his mother, who called the police promptly. These actions by Owens and his mother establish that Owens and his mother were aware of the existence and timing of any injury by Adams or MPS. Therefore, Owens may not assert now that he was unaware of the injury and the damage until years later.

Now therefore,

IT IS ORDERED that the defendants' motion for summary judgment is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that plaintiffs' equal protection Title IX and state law negligent supervision claims are dismissed.

IT IS FURTHER ORDERED that all claims of Timothy Owens are DISMISSED.

Dated at Milwaukee, Wisconsin, this 22nd day of March, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge